UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

YELLOWPAGES PHOTOS, INC.,

    Plaintiff,

v.                                                     Case No: 8:17-cv-764-T-36JSS

YP, LLC and PRINT MEDIA LLC,

    Defendants.
_____/

# **ORDER**

This matter comes before the Court upon Defendants' *Daubert* Motion to Exclude Testimony of Joseph J. Brown (Doc. 118), and Plaintiff's response thereto (Doc. 134). In the motion, Defendants argue that Brown's expert opinion should be excluded because it is not based on sufficient facts or data and is not the product of reliable principles and methods. Doc. 118. Plaintiff responds that Brown is a qualified expert whose opinion is based on his experience and review of Defendants' advertisements containing Plaintiff's images. Doc. 134. The Court, having considered the motion and being fully advised in the premises, will grant Defendants' Daubert Motion to Exclude Testimony of Joseph J. Brown.

## I.    BACKGROUND AND FACTS

Plaintiff Yellowpages Photos, Inc. ("YPPI" or "Plaintiff") filed this action against Defendants YP, LLC, d/b/a "The Real Yellow Pages" ("YP"), and Print Media, LLC, d/b/a Print Media Solutions, LLC ("Print Media") (collectively, "Defendants"), alleging that Defendants infringed on YPPI's copyrights, and requesting that as part of YPPI's damages that Defendants be required to disgorge all profits they derived from their infringement of YPPI's images. Doc. 45 ¶¶ 36(c), 48(c).

To support its claim for profits, YPPI retained Joseph J. Brown ("Brown") to provide opinions regarding whether revenue received from the sale of advertisements containing one or more of YPPI's copyrighted images is reasonably related to the use of the YPPI copyrighted images. Doc. 118-2 at 2. Brown is the principal of a graphic design firm specializing in yellow page advertising, production, billing, data management, and pagination software. *Id.* at 5. Brown has worked for and on behalf of small publishers and large independent yellow page publishers. *Id.* In forming his opinion in this case, Brown reviewed "samples of advertisements that appeared in YP-branded yellow page directories, which ads contain one or more of YPPI's copyrighted images." *Id.* at 2.

In his expert report, Brown explained that the yellow page industry considers the R.A.S.C.I.L. factors in creating advertisements. *Id.* These letters stand for Reliability, Authorized Products and Services, Special Features, Completeness of Service, Illustrations and Photos, and Location. *Id.* at 2-3. The reliability factor concerns connecting a business's history and associations in a way that inspires consumer confidence. *Id.* at 2. The authorized products and services factor relates to providing written content that highlights brands, products, and services that are offered by the business being advertised. *Id.* The special features factor stands for highlighting the products, services, or practices that make the business being advertised unique amongst its competitors. *Id.* at 3. The completeness of service factor relates to answering questions about payment types accepted, business hours, consultation information, and anything else that might be important to consumers. *Id.* The illustration and photos factor relates to creating impact and visually telling a story about the business and what it sells. *Id.* The final factor, location, relates to addresses, directions, websites, phone numbers, e-mail addresses, and other information that helps customers find or contact the business being advertised. *Id.*

Brown's report focuses on the illustrations and photos factor. *Id.* Brown states that advertisers value using images because photos and illustrations "give an ad the opportunity to create interest, show off products, demonstrate services, and convey emotions that can be seen with just a quick glance by a browsing user." *Id.* Brown indicates that "[w]ithout images, an ad is not useless, but it is certainly disadvantaged by competing ads with supporting illustrations and photos found in the same heading." *Id.*

Brown explains that "[g]ood print advertising always tells a story and just like a children's book, it would be boring without imagery." *Id.* Customers do not want to read lengthy advertisements, especially where an image can quickly convey the information for which he or she is searching. *Id.* Brown uses the example of a customer seeing an image depicting plumbing services when searching for a plumber in the midst of a plumbing emergency. *Id.* A customer can quickly see the image without reading lengthy advertisements in search of his or her needs. *Id.* Brown opines that images sell advertisements. *Id.*

With respect to the case at hand, Brown opines that "[b]ased on the advertisements presented showing the inclusion of YPPI's photographs, [he could] state without a doubt, that th[e images] played a key supporting role in the overall ad composition and assisted in telling the story behind products and services offered by the advertiser." *Id.* He supports this conclusion based on "the customer's approval of the ad proof," in which Defendants' customers—the advertising companies—"certifie[d] that the advertisements presented would serve to promote their company in a way that is in-line with their business practices, offerings and identity." *Id.* In Brown's experience, even where the customer already signed an advertising contract, the customer is always promised "an ad proof where [the] customer has a chance to approve an ad's design and content or even cancel if [the customer] feel[s] it d[id] not represent their business." *Id.* Ultimately, Brown

3

opined that "the use of YPPI's images in the advertisements is related to the revenue that Defendants received from their customers for Defendants' publication of the advertisements." *Id.* at 4.

## II.     LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 is a codification of the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In *Daubert*, the Supreme Court described the gatekeeping function of the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." *Id.* at 589; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*). The Supreme Court extended its reasoning in *Daubert* to non-scientist experts in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

> In performing its gatekeeping function, the Court must consider whether:
>
> (1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*, and (3) the testimony assists the trier of fact, through the application of scientific,

> technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Thus, the three discrete inquiries to determine the admissibility of expert testimony are qualifications, relevance, and reliability. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1341 (11th Cir. 2003). Although there is some overlap among these inquiries, they are distinct concepts that the Court and litigants must not conflate. *Id.*

"The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004). "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1113 (11th Cir. 2005). The admission of expert testimony is a matter within the discretion of the district court, which is afforded considerable leeway in making its determination. *Frazier*, 387 F.3d at 1258.

## III. DISCUSSION

"[E]xperts may be qualified in various ways." *Architects Collective v. Pucciano & English, Inc.*, 247 F. Supp. 3d 1322, 1333 (N.D. Ga. 2017). Although scientific training or education is one way of becoming a qualified expert, a person may obtain expert status through experience in a field. *Id.* (citing *Frazier*, 387 F.3d at 1260-31). "Thus, 'there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field.'" *Id.* (quoting *Santos v. Posadas de Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006)). Courts have noted that "the *Daubert* standard, which arose in the context of scientific or mathematical research and analysis, is often difficult to apply in the context of copyright infringement involving

5

expressive or artistic work." *Latele Television, C.A. v. Telemundo Commc'ns Grp, LLC*, No. 12-22539-CIV, 2014 WL 7150626, at *5 (S.D. Fla. Dec. 15, 2014). "In this context, the court's primary role in addressing an expert's methodology is whether 'basing testimony upon professional studies or personal experience, [the expert] employs in the courtroom the same level of intellectual rigor that characterizes [her practice] in the relevant field.' " *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 152).

Here, YPPI seeks to have Brown qualified as an expert based on his years of experience working in yellow pages advertising, production, billing, data management, and pagination software. Doc. 134 at 2; Doc. 134-1 at 7. Because Brown's opinion is not scientific or technical, YPPI contends that Brown's opinion that "inclusion of YPPI images in the Defendants' yellow pages ads is related to the revenue Defendants received from the sale of those ads does not require a 'reliable methodology' as would be needed if one were testing a scientific theory or even opining as to an appraisal." Doc. 134 at 5-6. Instead, YPPI asserts that the test to be used here is whether Brown's testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Id.* at 6.

Brown may rely on his experience to be designated as an expert. However, Defendants do not challenge his knowledge, but instead challenge whether his opinion is based on sufficient facts and data, and whether he employed reliable principles and methods in forming his opinion. Those issues are discussed below and analyzed in light of the context of Brown's expertise arising from his experience in his field.

### A. Whether Brown's Opinion is Supported by Sufficient Facts and Data

Defendants argue that Brown's deposition demonstrates that he lacks knowledge of facts to enable him to express a reasonably accurate conclusion, and that there is too great of an

analytical gap between the data he reviewed and the opinion he proffered to allow him to provide an expert opinion consistent with the requirements of Rule 702. Doc. 118 at 3.

In support of this argument, Defendants provide excerpts of Brown's deposition testimony. Doc. 118-3. In his deposition, Brown testified that he did not review any comparable images available for licensing in the marketplace, did not compare the quality of YPPI's photos to those available from any other company, had no personal experience with Defendants' sales process, did not know the number of images that Defendants license, did not know whether Defendants' customers saw mockups of advertisements before purchasing them, did not review advertisements by Defendants that did not contain YPPI images, did not review information regarding how Yellow Pages prices its advertisements, did not know whether Yellow Pages adheres to the RASCIL factors, and did not ask for information regarding whether the RASCIL factors were used by Yellow Pages in relation to this case. *Id.* at 1-14. Additionally, Brown did not have any evidence that any customers would not have purchased an advertisement if it did not contain a YPPI image, did not know of any instances in which a customer purchased an advertisement because it had a YPPI image, and did not know of any instance in which a YPPI image helped sell an advertisement to a customer, did not know of any instance in which a Yellow Pages customer requested a YPPI image, and did not have any evidence of a customer cancelling or demanding to pay less for an advertisement because a YPPI image was removed. *Id.* at 20-21, 23-24. Brown further testified that he did not call any of the customers whose advertisements he reviewed to learn whether the YPPI image influenced the customer's decision to purchase the advertisement. *Id.* at 26.

YPPI responds that it was unnecessary for Brown to interview all of Defendants' advertisers because YPPI's images were indisputably purchased by Defendants' advertisers. Doc.

7

134 at 5. YPPI also argues that it would be practically impossible to interview all of Defendants' advertisers because of the volume of infringing advertisements and customers. *Id.*

The Court finds that YPPI has not met its burden of laying the foundation for admissibility of Brown's expert opinion. Brown's deposition displays a dearth of knowledge underlying his opinion. He has done no more than review the advertisements containing YPPI's images, and concluded based on this review, with no further information, that Defendants' profits are related to use of YPPI's images. While it may have been impractical to interview all of Defendants' customers, Brown could have interviewed some, but failed to even attempt to do so. Doc. 118-3 at 26. Nor did he investigate Defendants' pricing structure or review the database of non-YPPI images available to Defendants. *Id.* at 4-5. Brown had no idea whether YPPI's images played any part in any of Defendants' sales because he did not have any information on this topic and, therefore, his opinion is not supported by sufficient facts or data. *Cf. Bussey-Morice v. Kennedy*, No. 6:11-CV-970-Orl-36GJK, 2012 WL 8010853, at *3 (M.D. Fla. Dec. 28, 2012) (excluding an expert who provided an opinion on damages because the expert did not have sufficient underlying information to form his opinions). Moreover, as described below, YPPI failed to show that Brown's opinion is sufficiently reliable.

**B.      Whether Brown's Opinion is the Product of Reliable Principles and Methods**

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Cook ex rel. Estate of Tessier*, 402 F.3d at 1111. Bare assurances by the expert that he or she used reliable or accepted methods are not sufficient to establish reliability. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005). Additionally, an expert's opinion must be supported by "good grounds for every step in the analysis," meaning "that any step that renders the analysis

unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Id.* at 1245. In other words, "an expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion." *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003).

Defendants argue that Brown's opinions are *ipse dixit* and lack any reliable methodological basis. Doc. 118 at 5-7. Defendants contend that even though Brown is relying on his experience as a basis for his expertise, he is nevertheless still required to "explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of this case." *Id.* at 5 (quoting *Frazier*, 387 F.3d at 1265). That is, indeed, the law. *Frazier*, 387 F.3d at 1261, 65.

Defendants point out that Brown's report does not show that he applied any methodology at all, let alone a reliable methodology. Doc. 118 at 6. YPPI, however, contends that Brown's methodology was to review the advertisements and apply his knowledge and experience in the yellow pages advertising industry. Doc. 134 at 6. Simple reliance on experience, however, is not sufficient to meet the Court's gatekeeping requirement. *Frazier*, 387 F.3d at 1265 (concluding that a witness could not simply rely on his experience to qualify as an expert without explaining how that experience led to the conclusion reached). YPPI simply has not provided any basis on which this Court may find that it met its requirement of laying a foundation for Brown to testify as an expert.

Moreover, none of the cases relied on by YPPI are persuasive. First, YPPI relies on the decision in *Gulf Coast Turf and Tractor LLC v. Kubota Tractor Corporation*, No. 8:17-cv-2787-T-24 AEP, 2019 WL 1426306, at *2 (M.D. Fla. Mar. 29, 2019), in which this Court denied a *Daubert* motion seeking to exclude the testimony of an expert on lost future profits in a case claiming a violation of Florida's Unfair and Deceptive Trade Practices Act. The party seeking to

9

exclude the expert, the defendant, argued that his calculations were based on speculation and did not satisfy the *Daubert* standard. *Id.* The calculation of lost profits in that case was "based on actual sales that Kubota made to a specific customer," and the Court concluded that it was "unclear why [the defendant] believe[]d that the calculation of [the plaintiff's] lost profits (based on lost Delivering Dealer commissions) would be speculative." *Id.* Accordingly, the Court denied the *Daubert* motion.

*Gulf Coast Turf and Tractor* is not of aid to YPPI here. There, the plaintiff provided a basis for its calculations. Here, Brown provided no explanation as to how he determined that Defendants' use of YPPI images is related to Defendants' profits. He simply states that it is. There is no indication that Brown's opinion is based on anything other than the opinion that images are important to selling advertisements. He does not tie his opinion specifically to YPPI's images. For example, he did not review other images available to Defendants to use in advertisements in lieu of the YPPI images and conclude, based on his experience, that use of YPPI's images, not others, allowed Defendants to sell advertisements. He did not provide information that some specific quality of YPPI's images, compared to other available images, rendered them particularly impactful for those seeking to advertise. He did not even provide information that certain qualities of photographs—such as angling or types of colors—make them particularly impactful, and those qualities are present in YPPI's photographs. Nor did Brown conduct interviews of any of Defendants' clients to determine whether use of YPPI's images specifically, and not others available to Defendants, were the reason that the customers purchased advertisements from Defendants. Indeed, Brown does not even opine that Defendants' profited from use of YPPI's images because being able to draw from YPPI's pool of images increased the database of potential images from which they could draw, attracting customers who desired a large number of options.

In short, Brown's opinion is formed solely on reviewing the images and no discernable methodology was used in forming his opinion, other than speculation.

Likewise, YPPI's reliance on *Schwarz v. City of Treasure Island*, No. 8:05-cv-1696-T-30MAP, 2010 WL 11474650 (M.D. Fla. Oct. 12, 2010), is misplaced. In *Schwarz*, the parties both moved to strike or exclude expert witnesses on the basis that the experts' methodologies were flawed and unreliable. *Id.* at *1. The Court stated that "[a]s an initial point, the record is clear that both . . . Plaintiffs' economic expert, and . . . Defendants' economic expert, are qualified to testify as experts in the damages phase of this case." *Id.* The Court denied the parties' respective motions because their "arguments essentially cancel[led] each other out, to the extent that both parties point out similar flaws that exist in the other's expert." *Id.* One expert conducted telephone interviews of seven former patients, who had been pre-screened by opposing counsel, and the other expert briefly spoke to three current clients, and no former clients. *Id.* The Court concluded that "any failure on the part of either expert to conduct credible independent research can be explored via cross-examination." *Id.*

The difference between *Schwarz* and this case is that in that case, interviews were conducted, whereas in this case, Brown has not interviewed any current or former clients of Defendants. Doc. 118-3 at 26. All he has done, as explained above, is review the photos, and given the bald opinion that use of YPPI's photos was related to Defendants' profits, with no explanation as to how he came to that conclusion. That is not sufficient to meet the Court's gatekeeping function. *Frazier*, 387 F.3d at 1265.

Finally, YPPI relies on *Jones v. Loews Home Centers, LLC*, No. 6:17-cv-2018-Orl-37TBS, 2019 WL 1254814, at *1 (M.D. Fla. Mar. 19, 2019), a products liability case involving the explosion of a leaf blower impeller. The defendants moved for summary judgment and to exclude

11

an expert's testimony and report as unreliable. *Id.* The expert was a registered professional engineer who specialized in failure analysis. *Id.* at *4. In that case, the expert used a "safety analysis known as the Failure Modes and Effects Analysis ("FMEA"), which is a step-by-step-approach for identifying all possible failures in a design, a manufacturing or assembly process, or a product or service." *Id.* (internal quotation omitted). In forming his opinion, the expert viewed the subject leaf blower, an example leaf blower, the pleadings, depositions, an affidavit, discovery materials provided by the defendants, industry standards, safety engineering books and references, a recall notice for the product and a similar product, and similar products sold by other companies. *Id.* The expert reached a conclusion as to the hazardous condition of the leaf blower, which he stated was a known industry failure, and that use of the impeller for the product was unreasonably dangerous. *Id.*

The defendants in *Jones* moved to exclude the expert's opinion as unreliable because he did not perform testing on the subject leaf blower or on his proposed alternative design. *Id.* The Court determined that FMEA is a well-established safety analysis method that is recognized in the field of engineering. *Id.* at *5. Moreover, the Court noted that Florida law does not require a plaintiff to prove the availability of an alternative design in a design defect case. *Id.* Additionally, competitors used the proposed alternate design, meaning that the expert was not required by *Daubert* to test his proposed alternate design. *Id.* Because of this, the Court found the expert's opinion to be admissible, stating that "Defendants' identified issues with [the expert's] testimony are proper fodder for cross-examination, not exclusion." *Id.*

The expert in *Jones* is clearly not analogous to Brown. The expert employed a recognized methodology, and reviewed numerous materials involved in the case. Here, as explained above,

12

Brown has not provided any methodology, nor has he reviewed material of the same quality as that reviewed by the expert in *Jones*. Accordingly, the Court is not persuaded by *Jones*.

The Court is persuaded by the reasoning of the court in *Snac Lite, LLC v. Nuts 'N More, LLC*, No. 2:14-cv-01695-RDP, 2016 WL 6778268, at *7-8 (N.D. Ala. Nov. 16, 2016), which was a dispute between two manufacturers of nut butters. The defendant marketed its nut butter as having a certain protein content, but the plaintiff, dubious of the defendant's claims, tested the defendant's nut butter and found that it had less protein than advertised. *Id.* at *1-2. The plaintiff sued the defendant, raising a claim for false advertising under the Lanham Act, and sought to recover as damages lost profits and disgorgement of the defendant's profits. *Id.* at *1.

The defendant in *Snac Lite* moved for summary judgment and moved to exclude the testimony of plaintiff's expert on the basis that he did not use a reliable methodology. *Id.* The expert the defendant sought to exclude provided opinions as to whether the parties were competitors, the protein content of the nut butter was the determinant attribute in buyers' decision-making, and the plaintiff's sales were adversely affected by the defendant's protein content claim. *Id.* at *3. In forming his opinion, the expert spoke to employees at two GNC stores, reviewed e-mail messages sent to a representative of the defendant, and conducted internet research to determine the benefits of a high protein diet and to learn more about the target customers of the defendant's products. *Id.* The defendant argued that (1) the expert's opinion that the plaintiff's sales were adversely affected should be excluded because it was not supported by facts or a reliable methodology (2) the expert's opinion as to the cause of the plaintiff's injuries should be excluded because the expert did not speak to any customers, conduct customer surveys, conduct focus groups, or interview any authorized representative of the defendant's distributors or retailers; and (3) the expert's opinion should be excluded because the expert failed to account for variables other

than the defendant's protein content claim that could affect the parties' sales positions. *Id.* at \*6. The Court granted the motion. *Id.*

In reaching its conclusion, the *Snac Lite* court found that the expert's opinion testimony was "wholly conclusory, and lack[ed] the methodology and support necessary to be helpful to a jury." *Id.* at \*7. More specifically, the expert did "not perform[] any significant analysis 'linking' Defendant's alleged misrepresentation to Plaintiff's lost profits, and as such his methodology fail[ed] to produce sufficient reliable information regarding causation." *Id.* Although the expert studied the relevant market, he did not analyze the plaintiff's marketing strategy or its target customers. *Id.* Significantly, although the expert provided an opinion that the defendant's purportedly false advertising caused the plaintiff's injury "based on comparison of the parties and the likelihood of injury," both "his expert report and deposition testimony fail[ed] to analyze the market for Plaintiff's products." *Id.*

Likewise, in the instant case, Brown simply did not provide any reliable methodology used to form his opinion. He provided no link between YPPI's images and Defendants' profits. He provided no analysis as to how YPPI's images were related to Defendants' profits. Brown's conclusory opinion lacks the methodology and support needed to be helpful to a jury. Accordingly, the Court will exclude his testimony because it does not meet the requirements of Rule 702. Accordingly, it is

**ORDERED**:

1.  Defendants' Daubert Motion to Exclude Testimony of Joseph J. Brown (Doc. 118) is **GRANTED.** Joseph J. Brown is excluded from providing testimony at the trial of this cause.

14

**DONE AND ORDERED** in Tampa, Florida on November 14, 2019.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any